**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George HARRIS and Angelo Mamone,
Defendants-Appellants.**

**Nos. 361, 362, Dockets 83–1169, 83–1170.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 2, 1983.
Decided April 13, 1984.

Richard A. Martin, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Robert S. Litt, Barry A. Bohrer, Asst. U.S. Attys., New York City, of counsel), for plaintiff-appellee.

Richard Paul Zipser, Southfield, Mich., for defendant-appellant Harris.

Robert L. Ellis, New York City, for defendant-appellant Mamone.

Before FEINBERG, Chief Judge, and FRIENDLY and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

George Harris and Angelo Mamone appeal from judgments entered on jury verdicts in the District Court for the Southern District of New York (Lloyd F. MacMahon, *Judge*), convicting them of conspiracy to distribute heroin in violation of 21 U.S.C. § 846 (Count One), and attempting to possess heroin with the intent to distribute in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (Count Two). Having previously been convicted of federal narcotics violations, both defendants were subject to the enhanced penalties provided in 21 U.S.C. § 841(b)(1)(A), and each received concurrent terms of twenty years on Counts One and Two, and a $50,000 fine.

On appeal defendants contend, among other things, that (1) the evidence was insufficient to support their convictions on either count, and (2) the district judge erro-

neously excluded testimony crucial to the defense. We agree with defendants that the evidence was insufficient to support their convictions on Count Two for attempting to possess heroin with intent to distribute; accordingly, we reverse and dismiss on that count. On Count One, we find that the evidence was sufficient to support defendants' conspiracy convictions, but because we agree with defendants' evidentiary claim, we reverse and remand for a new trial.

## I. BACKGROUND

The prosecution of Harris and Mamone was largely the product of an arrangement between the government and one Mahlon Steward, a narcotics dealer with a lengthy criminal record, who agreed to act as an informant and undercover operative for the federal Drug Enforcement Administration (DEA) following his most recent arrest in May 1981. Posing as a prospective heroin purchaser, Steward led the DEA to Harris, who, in turn, eventually led the DEA to Mamone.

### A. *The Government's Case*

The government built its case around the testimony of Steward and tape recordings of telephone conversations that Steward initiated with Harris. Steward testified that he had known Harris for approximately ten years and that he had recently supplied Harris with two and one-half to three kilograms of heroin for roughly $500,000 between the spring of 1980 and January 1981. Shortly after he agreed to cooperate with the government, Steward contacted Harris in Detroit, Michigan, where Harris resided, in an effort to have Harris supply him with heroin. According to Steward, Harris told him that Harris "had a New York connection and he would see what he can do for me."

Steward learned that Harris would be arriving in New York City on November 24, 1981, and staying at the Sheraton Park Center. On that day Steward placed the first in a series of recorded calls to Harris, at the hotel, and agreed to meet Harris there later that night. In the meantime DEA agents confirmed that Harris had registered at the New York Sheraton that day. The agents then rented a room across the hall from Harris, from which they were able to monitor Harris's activities.

At 8:30 P.M. the agents observed Harris leave his room, go to the lobby, and wait outside the hotel. Several minutes later Harris entered a light blue, late model Oldsmobile 98 occupied by two white males. Although the agents conducting surveillance were unable to identify either of the men in the vehicle, one of the agents did observe that the car had New York plates and that the first two digits were 57. It was stipulated at trial that from November 1, 1981, to December 31, 1981, a blue 1980 Oldsmobile, New York registration number 573 GFY, was registered to Mamone's wife, at an address where Mamone then resided.

After Harris returned to the Sheraton around midnight, Steward telephoned him from the lobby and then went upstairs to Harris's room to talk to him. Steward testified as to the conversation as follows:

Q. Can you tell the jury what you talked about during that conversation?

A. I talked to him about me purchasing an eighth of heroin, and he told me that at this time it was pretty—things were pretty tough. His man was having problems. In fact, they were having some kind of war, and he told me that the man is a friend of ours.

Q. Did he tell you the name of that friend that you had in common?

A. Yes; Junior.

Q. You knew who that was?

A. Oh, Yes.

\* \* \* \* \* \*

Q. Did you have any conversation with Mr. Harris concerning what he had done earlier that evening?

A. He told me that he went out to dinner with the connection and that he would see what he could do for me very soon, that he would get back with me.

He told me that at that time he was having problems.

\*   \*   \*   \*   \*   \*

Q.  How did you leave things that evening with respect to these arrangements?

A.  We had an understanding that whenever he did get in touch with his connection and they were on again, whenever they were back in business again, he would put me down, that I would be able to purchase the heroin from them.

Steward next met with Harris on January 24, 1982, when Steward "went out to the Super Bowl in Detroit." At a hotel near the Detroit airport, Steward asked Harris what Harris "could do on the New York end." According to Steward, Harris "told me at this time that things were pretty tight. Right now he couldn't do anything right at that moment, but he said he would see what he could do."

Three days later, on January 27, Steward and Harris met again in Detroit at the Imperial Market where Harris worked. Steward introduced Harris to special agent John Jackson, who was posing as Steward's "nephew". During the course of a 45-minute drive through the Detroit area in Harris's car, Steward and Jackson told Harris that they had $40,000 in the trunk of their car. Steward testified that Harris

claimed that he could get an eighth for 48, but it was too high. We said it was too high. He said at that time that's why he wasn't going to bother with buying it himself because the price was out of hand. He said he would sweat it out until the price came down.

When asked by the prosecutor how he left things with Harris, Steward explained:

We had an understanding, George and I and my nephew who was the special agent that he would get in touch with us and cut us into the New York connection whenever he got into New York and make arrangements for us to purchase whatever we needed on a continuity basis. Someone would be able to take care of us throughout the whole period that I might need it.

Steward testified that over the next several months, he and Harris had many telephone conversations. Although he supposedly received numerous calls from Harris, however, Steward was able to record only those calls that he placed to Harris.

The first of the recorded calls that Steward initiated during this period occurred on February 3, one week after Steward returned from Detroit. During that conversation, Steward inquired in "coded" fashion, "You didn't get your car yet huh?", and reminded Harris, "I, uh, told you what I could do." Harris responded, as he had the previous week, "See I just say I was gonna sweat it out ..." When Steward stressed, "You know it's kind of important that I do", Harris assured him, "As soon as I can I'll let you know."

In the next recorded call, on February 12, Steward inquired, "Is, is there any way possible for you to do what I asked you to do?" Once again, Harris failed to provide a definite answer.

Similarly, on March 13 Steward asked, "Is that call gonna be today?" This time Harris responded, "Uh, mm, no, uh uh uh y'know what I mean? I need to know what ... if you can raise that cab today?" Steward replied, "Uh, I can do it Monday, no question, but I wanna know when they're gonna call me." Harris told Steward, "Well um I'll I'll talk to you before that."

Following an uneventful call on March 30, Steward again contacted Harris on April 9. Boasting that "I'm doing okay as far as y'know moneywise, kid", Steward suggested that Harris "[r]each the big guy \* \* \* [a]nd, uh, let me know through him \* \* \* [w]hen ya comin and when ya gonna arrange with that guy and we'll y'know and we'll be able to do something." This prompted the following exchange:

HARRIS: Uh, well uh uh I'm gonna be comin' thata way pretty soon.

STEWARD: Oh, Okay. You, uh, you got any. You got any any ideas just. . . .

HARRIS: I don't have no idea but I tell the big guy

STEWARD: Uh huh

HARRIS: Cause I figure you gonna tap him all the time.

STEWARD: All the time, yeah.

Then, following another insignificant call on April 12, Steward placed yet another call to Harris on April 28, during which this conversation ensued:

STEWARD: * * * Then uh, see, what uh what I would like you to do is if you y'know on your end is just see that me and this dude get together...

HARRIS: Uh, huh.

STEWARD: And uh lay the groundwork so I can, uh, negotiate, y'know, good terms.

HARRIS: Okay.

STEWARD: And that's what I want to do. I don't want to just go for that flim flam.

HARRIS: I know that.

STEWARD: Y'know I ain't goin for that any more either, after y'know what I could, what I been shoppin around and seein, man.

HARRIS: Well did I tell ya I called the shot on that there way up the line.

STEWARD: Yeah, man you shop around man ya get ... Shit.

HARRIS: Mm.

STEWARD: Things is much better.

HARRIS: Yeah.

STEWARD: So now I figure man maybe with this dude y'know, a little continuity.

HARRIS: Y'know we can box it in where I can get maybe a per cent, or something.

STEWARD: Right, yeah. There you go.

HARRIS: Yeah.

STEWARD: Yeah, there's the way also, um. You gotta ride a white horse too. We're all good guys.

The culmination of these cryptic conversations occurred on May 6, 1982. Steward testified that on that day he received four telephone calls, three from Harris and one from an individual unknown to him at the time, but whom he subsequently identified by voice as defendant Mamone. In the first call, at approximately 5:30 P.M., Harris asked Steward if Steward "ha[d] the 40,000 on hand." Looking to buy time, Steward told Harris that he would explore the matter and get back to him. Steward immediately notified the DEA that "the deal was going to go down" and was informed that the necessary money would be available.

When Harris called Steward back, Steward informed him that he had the money ready. Steward then received a call from a man whose voice he did not recognize. The caller told Steward that "the Old Timer [a nickname of Harris's] said to call you" and arranged to meet Steward at 11:00 P.M. outside Junior's restaurant at the corner of Flatbush and DeKalb Avenues in Brooklyn, New York. At around 9:00 P.M. Harris called Steward again "confirming that he had talked to his man" who was prepared to meet Steward.

As arranged, Steward arrived at Junior's around 11:00 P.M., accompanied by agent Jackson who was again posing as his nephew. Several minutes later Steward and Jackson were approached by a man who called Steward by his nickname "Bunny" and said "the Old Timer sent him." Steward identified this man at trial as defendant Mamone. Steward also testified that he recognized Mamone's voice as that of the man who had called him earlier that evening and arranged the meeting.

With agent Jackson acting as a lookout, Steward spoke briefly with Mamone as they walked alongside Junior's. Initially, Mamone asked if Steward had "the package" for him. Steward responded that he had $40,000, but it was fifteen minutes away. Steward then attempted to initiate negotiations, but Mamone balked, directing Steward to instead meet him at the Sheraton Center between 11:30 P.M. and 12:00 A.M.

As he walked away from Steward, Mamone was observed by special agent Garcia, who was on foot surveillance. Both agent Garcia and agent Jackson identified

Mamone at trial. Further, special agent Garrett, who was patrolling the vicinity in his car, testified that he saw Mamone depart in a late model, gray Chevy Nova, with a license number resembling 6404 AFT or 6804 AFH. It was stipulated at trial that at the time of this incident, a gray 1977 Chevy Nova was registered in the name of Mamone's wife at their home address and that the license number of that car was 6804 AFT.

Following Mamone's instructions, Steward and Jackson arrived at the New York Sheraton at approximately 11:50 P.M. that night. After waiting for nearly an hour for Mamone to arrive, they placed a call to Harris in Detroit, which was not recorded. According to Steward, Harris said that "the man called him and told him what happened", and "the man wasn't going to show up."

Steward called Harris again the next morning. During this conversation, which was recorded, Steward explained the "misunderstanding" that had occurred the night before by emphasizing his reluctance to part with the $40,000 without simultaneously receiving the heroin. In perhaps the most incriminating of the recorded conversations, Harris responded by repeatedly chastising Steward for not following the plan. For example, Harris said, "I told you * * * Don't say nothin, just hand it to him, I tell ya that", and "I says, man, just hand it to him and I'll see you Sunday, and you'd a had something, to run, forever." Harris also confirmed that he had talked with Mamone after Mamone had met with Steward.

Following the aborted deal on May 6, Steward recorded several calls with Harris between May and July 1982. Although some of the recorded dialogue bolstered the government's case with respect to the events up to and including May 6, Harris was either unwilling or unable to arrange any further transaction.

## B. *The Defense Case*

Forced to reckon with the tape recordings introduced by the government, the defense sought to portray Harris's conversations with Steward as "an eventually doomed and misguided attempt to maintain his parole status without jeopardizing his life." The defense thus attempted to establish that Harris knew Steward was an informant and only played along with him out of fear of what would happen to him if he refused.

There was some, albeit not overwhelming, support for this defense, grounded essentially on a theory of duress, *see generally United States v. Mitchell*, 725 F.2d 832 (2d Cir.1983), in the taped conversations quoted above, during which Harris was repeatedly pressured by Steward to arrange a heroin deal and repeatedly avoided any definite commitment. Beyond this, it was brought out on Steward's direct examination that Steward stopped trying to arrange a deal with Harris sometime in June 1982, when he learned from the DEA that Harris knew he was cooperating with the government. Agent Garcia also testified that he was aware in late May or early June that Harris knew that Steward was an informant. In his cross-examination of both Steward and Garcia, and to a lesser extent of agents Garrett and Roberto, counsel for Harris tried to show that the DEA suspected that Harris knew of Steward's true role as early as March.

To advance this defense one step further, counsel for Harris proposed at the completion of the government's case to call Rafael Hernandez, Harris's parole officer from Detroit, as his first defense witness. According to Harris's written offer of proof, submitted at the request of the district judge:

Rafael Hernandez will testify, it is believed, to the following:

1. He is a United States Government Employee—Federal Parole Officer.

2. He is the Parole Officer who supervises the parole of George Harris.

3. George Harris told Rafael Hernandez, at the time it occurred, of an encounter with some people who could cause him trouble. The statement of Harris was made around the time of

the Superbowl and he made a note of it in his records, especially referring to the state of mind of George Harris.

4. That during the period of time of the time charged in the Indictment, George Harris expressed to Rafael Hernandez that the Government and people were after him and trying to set him up. Rafael Hernandez indicated that in his notes of his records and that Harris exhibited worries or paranoia over this, and further that Harris was upset.

5. That Harris indicated the Government was trying to set him up and eventually furnished the name of the person he thought was Rudy Steward.

6. That as an employee of the United States Government and as their representative, Rafael Hernandez Kept records and a file with regular notes and recordations, including the information above. That he kept these records at times as memorandum of events and/or others reasons in a regular practice. That the above incidents are reflected in these records.

After hearing brief argument, the district judge excluded this proffer, reasoning that "[i]t is plainly blatantly hearsay, unreliable and self-serving." When counsel for Harris then made an oral offer of proof with respect to similar proposed testimony by Ira Auslander, Harris's Detroit counsel, the district judge ruled "I would exclude that on the same ground. * * * If I am wrong, I am sure the Second Circuit knows their cases."

## II. DISCUSSION

### A. *The Sufficiency of the Evidence on Count Two*

To understand defendants' claim with respect to the sufficiency of the evidence on Count Two, attempt to possess heroin with intent to distribute, it is first necessary to focus on certain events that took place before and during trial. The original indictment, filed on January 27, 1983, charged defendants with a conspiracy to distribute and to possess with intent to distribute (Count One), and with the substantive offense of possession with intent to distribute (Count Two). Then, at a pretrial conference on March 14, the government informed the district judge and opposing counsel that it planned to supersede Count Two of the original indictment and "charge attempt * * * so that it will make it a clearer presentation for the jury." The next day, the government filed the instant indictment, charging in Count Two that defendants "unlawfully, intentionally and knowingly did attempt to possess with intent to distribute, a Schedule I narcotic drug controlled substance, to wit, approximately one-eighth kilogram of heroin * * *".

Although the government thus formally amended Count Two to charge attempted possession instead of actual possession in order to "make it a clearer presentation for the jury", its actual presentation at trial focused on neither of those possession charges but instead concentrated on a distinctly different offense: attempted distribution. In its opening statement, for example, the government told the jury on four separate occasions that "[t]he second count against these two defendants charges that they *attempted* on May 6, 1982, *to sell* one-eighth kilogram of heroin"; "the evidence in this case will establish that the defendants conspired *to sell* heroin together and they *attempted to do it* on May 6, 1982"; "[t]he government argues that that was an *attempt to distribute* heroin"; and that defendants "*attempted to sell* one-eighth kilogram of heroin in May, 1982, for $40,000". (Emphasis added). As is apparent from our recitation of the facts, these statements were perfectly consistent with the evidence that the government subsequently introduced.

The government's misinterpretation of Count Two was also reflected in its summation, during which it argued to the jury "[t]he second count charges that they *attempted an actual distribution* of narcotics, heroin, on May 6, 1982"; "the second count charges that the defendants *attempted to sell* one eighth kilogram of

heroin on May 6th"; and "that was the *attempted distribution*." (Emphasis added). Even in its brief on appeal, the government has persisted in its delusion that Count Two charges attempted distribution. For example, Point IV of the government's brief is titled "The Evidence Amply Proved That Harris And Mamone *Attempted To Distribute* Heroin." (Emphasis added). Similarly, in a footnote, the government remarks: "The only change made in the superseding indictment was to specify in Count Two that the defendants were charged with *attempted distribution* of heroin on May 6, 1983 [sic: 1982], as distinguished from possession with intent to distribute heroin as charged in the original indictment." (Emphasis added).

This variance between the charges contained in Count Two and the proof at trial was not overlooked by defense counsel. At the conclusion of the government's case in chief, both defendants moved for judgments of acquittal on Count Two, contending, among other things, that

* * * there is no evidence in this record that either defendant took even the first step to possess a narcotic drug. The charge here is no longer that they possessed it.

May be the circumstancial [sic] evidence arguably could show that there is enough to go to the jury on a possession charge. That charge is withdrawn. Did they do something to attempt to possess it. They did nothing, your Honor, on this record.

In opposing these motions, the government failed to come to grips with the issue raised by defendants, arguing instead that "there was clearly an attempt to distribute because Mr. Mamone was there to pick up the $40,000, and Mr. Harris confirms in the conversation the following day that the delivery was to occur." Counsel for Mamone tried once again to make his point, stating "Judge, Mr. Martin argued an attempt to distribute. The charge is an attempt to possess. Nothing was shown with respect to an attempt to acquire a drug or possess it. It is just not in the record, Judge."

However, the district judge simply replied, "I have had enough argument", and he denied both defendants' motions.

Whether the district judge actually appreciated the point pressed by defendants is not altogether clear. It is worth noting, however, that in his charge to the jury, the district judge confined himself to the elements of the crime actually charged in Count Two of the superseding indictment—attempt to possess with intent to distribute. He did not mention attempt to distribute, the crime argued by the government and arguably supported by the evidence, nor did he relate the evidence to the crime charged.

Since the jury had heard evidence and argument about an attempt to distribute heroin and a charge that focused on possession, it is not surprising that soon after deliberations began, they sought clarification of the law "on the meaning of knowingly did attempt to possess." Even then, however, all the court did was repeat its original instruction about possession with no attempt to relate it to the evidence and arguments about distribution.

██ Under these unusual circumstances, we conclude that the evidence was insufficient to support defendants' convictions for attempt to possess with intent to distribute. Viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence established that Mamone attempted to distribute heroin to Steward and that Harris, acting as a broker, aided and abetted that attempt. But there was no direct evidence that either defendant attempted to possess any heroin, and no other basis for the jury to find beyond a reasonable doubt that they did.

The government's case pictured Harris as a broker and Mamone as the supplier of heroin. As a broker in the transaction, however, it simply was not necessary for Harris to ever possess any heroin, either actually or constructively, or to attempt to do so. Thus, by adducing evidence sufficient to convict Harris of attempted distribution, the government would not neces-

sarily have accomplished the same with respect to attempted possession.

■ The situation is somewhat different with respect to Mamone, since he was supposedly the seller in the proposed transaction, and the jury could have inferred that the parties expected that Mamone would actually deliver the heroin. On this record, however, the evidence is insufficient to convict Mamone of attempted possession of heroin. A buyer may be attempting to possess when he negotiates for a sale. And a seller may be attempting to distribute when he enters such a negotiation. Without more evidence to show what was happening on the seller's side, however, proof of an unsuccessful deal unaccompanied by any evidence that drugs were present, or even immediately available, is insufficient to convict the would-be seller of attempted possession.

Consequently, both defendants' convictions on Count Two must be reversed, and Count Two must be dismissed.

### B. The Sufficiency of the Evidence on Count One

■ Unlike Count Two, attempt to possess, we have little difficulty rejecting defendants' claims regarding the sufficiency of the evidence on the Count One conspiracy. Viewed in the light most favorable to the government, *Glasser v. United States, supra,* the evidence of an agreement between Harris and Mamone to sell heroin to Steward was overwhelming.

■ Defendants' argument that there was no firm agreement with Steward because "the method of transfer was never agreed upon" and "the final terms of the deal had [not] been made" misses the mark entirely. Whether either Harris or Mamone reached a "final agreement" with Steward was of no moment. At issue on Count One was not whether an enforceable contract of sale had been made, but whether there was an agreement between Harris and Mamone to supply heroin to Steward, and there was ample evidence for the jury to find beyond a reasonable doubt that the government had proved such an agreement.

### C. The Exclusion of the Proffered Testimony of Harris's Parole Officer and Attorney

We turn next to Harris's argument that the district judge erroneously excluded the proffered testimony of his parole officer and attorney on the ground of hearsay. Harris claims that this testimony was not hearsay under Fed.R.Evid. 801(c) since it was offered not to prove the truth of its assertions to the effect that Steward was a government agent, but instead only to show that Harris *thought* he was. Harris further argues that even if the proffered statements were hearsay, they were nevertheless admissible under Fed.R.Evid. 803(3), the hearsay exception covering statements of a declarant's then existing state of mind. We agree with these contentions.

When the matter of the parole officer's testimony was first raised prior to trial, the district judge instructed defense counsel to submit a written offer of proof before having the witness take the stand. At the conclusion of the government's case, defense counsel did just that, and the district judge, having read Harris's trial brief on this point, excluded the proferred testimony of the parole officer as hearsay. Defense counsel then proposed for the first time to call Harris's Detroit attorney for essentially the same purpose, but his oral offer of proof was summarily rejected.

Because of the manner in which these matters were handled, it is not clear precisely how either of these witnesses would have testified. Though both witnesses were present at trial, the district judge made his rulings without first requiring a *voir dire* of either witness. Consequently, in assessing the competing arguments on appeal concerning the admissibility of the proffered testimony, we are unable to conduct the rigorous analysis that is often necessary to determine whether a particular statement is properly regarded as hearsay or whether a particular statement falls

within one of the hearsay exceptions. These issues, as well as the related issue of relevancy, frequently turn on the actual language, particularly the tense of the proferred testimony, as well as its time frame. Here, however, we are left with only the written offer of proof of the parole officer, quoted above, which is susceptible to varying interpretations, particularly as to time, and defense counsel's oral representations that Harris's Detroit attorney would testify "that exactly around the time of the Super Bowl * * * Mr. Harris told him that Mr. Steward had brought an agent to him, that he believed he brought an agent to him."

■■■■ Taking these offers of proof at face value, as unfortunately we must on this record, we believe the district judge erred in excluding the proffered testimony as hearsay. Depending on the precise phraseology used by each witness, their testimony would have been admissible either as nonhearsay, or under the then existing state of mind hearsay exception. To the extent that Harris told either witness that he had "an encounter with some people who could cause him trouble"; that "the Government and people were after him and trying to set him up"; that "the Government was trying to set him up" (written offer of proof of Rafael Hernandez); and/or that "Mr. Steward had brought an agent to him" (oral offer of proof of attorney Auslander), the district judge erred in characterizing these statements as hearsay under Fed.R.Evid. 801(c). These statements were admissible, not for their truth, but instead as circumstantial evidence of Harris's state of mind—his knowledge of Steward's cooperation. *See United States v. Parry*, 649 F.2d 292, 295 (5th Cir.1981). On the other hand, to the extent that Harris told either his parole officer or attorney "that he *believed* [Steward] brought an agent to him" (emphasis added) (oral offer of proof of attorney Auslander), this statement would indeed have been hearsay under Fed.R.Evid. 801(c), since its evidentiary significance depended on the truth of the matter asserted—Harris's belief. However, such a "statement

of the declarant's then existing state of mind" should have been admitted as a hearsay exception under Fed.R.Evid. 803(3). *See United States v. DiMaria*, 727 F.2d 265 at 271 (2d Cir.1984) (citing cases).

The government's attempt to avoid these conclusions is unpersuasive. The government begins by emphasizing "the substantial overlap between statements asserting the declarant's state of mind, and those offered as circumstantial evidence of that state of mind" and, quoting 4 *Weinstein's Evidence*, ¶ 803(3)[02], at p. 803–96, suggests that "[r]ather than focusing on academic analyses intent on rigid classification, it would be more profitable to analyze the probative value of the statement and to examine the dangers stemming from its admission in light of other factors." The "other factor" the government deems most significant is whether "the circumstances indicate plainly a motive to deceive".

The manner in which the government derives this "other factor" is rather disingenuous. Relying on a statement in the Advisory Committee Notes that Fed.R. Evid. 803(3) is "essentially a specialized application" of Fed.R.Evid. 803(1), the government argues, based on language appearing in the Advisory Committee Notes to Fed.R.Evid. 803(1), that the admissibility of a particular statement should depend on whether the surrounding circumstances "negative the likelihood of deliberate or conscious misrepresentation." However, the full paragraph from which this quotation is lifted conveys a different impression:

> The underlying theory of Exception [paragraph] (1) is that substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation. Moreover, if the witness is the declarant, he may be examined on this statement. If the witness is not the declarant, he may be examined as to the circumstances as an aid in evaluating the statement. Mor-

gan, Basic Problems of Evidence 340–341 (1962).

■ Read in context, it is apparent that the language quoted by the government is an explanation of the reasons for having created exceptions (1) and (3), rather than an additional qualification which a court is entitled to impose on a statement otherwise falling within their terms. We recently recognized this point in *United States v. DiMaria, supra,* 725 F.2d at 272. As Judge Friendly observed there:

It is doubtless true that all the hearsay exceptions in Rules 803 and 804 rest on a belief that declarations of the sort there described have "some particular assurance of credibility." * * * But the scheme of the Rules is to determine that issue by categories; if a declaration comes within a category defined as an exception, the declaration is admissible without any preliminary finding of probable credibility by the judge, save for the "catch-all" exceptions of Rules 803(24) and 804(b)(5) and the business records exception of Rule 803(6) ("unless the source of information or the method or circumstance of preparation indicate lack of trustworthiness"). As Judge Weinstein has stated, "the scheme adopted for the hearsay article in the federal rules is that of a system of class exceptions coupled with an open-ended provision in Rules 803(24) and 804(b)(5), and with the exemption of certain prior statements from the definition of hearsay." * * *, even though this excludes certain hearsay statements with a high degree of trustworthiness and admits certain statements with a low one. This evil was doubtless thought preferable to requiring preliminary determinations of the judge with respect to trustworthiness, with attendant possibilities of delay, prejudgment and encroachment on the province of the jury.

(Citations omitted).

We realize that under certain circumstances a *defendant* may object on the ground of probable unreliability to admission of a declaration of a nonwitness which is within an exception to the hearsay rule or is not hearsay. *See Ohio v. Roberts,* 448 U.S. 56, 62–66, 100 S.Ct. 2531, 2537–39, 65 L.Ed.2d 597 (1980); *United States v. Puco,* 476 F.2d 1099, 1102–05, 1106–07 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). This, however, is because of a defendant's special rights under the confrontation clause of the sixth amendment—a protection not extended to the government. *United States v. DiMaria, supra* at 272 n. 6.

■ Having determined that the district judge erred in excluding the proffered testimony of Harris's parole officer and attorney, we must now determine whether this can be considered "harmless error". We hold that it cannot. "Courts are particularly reluctant to deem error harmless where * * * the error precludes or impairs the presentation of an accused's sole means of defense." *United States v. Carter,* 491 F.2d 625, 630 (5th Cir.1974), (quoting *United States v. Paquet,* 484 F.2d 208, 214 (5th Cir.1973) (concurring opinion)). Here, Harris's parole officer and attorney were to be the only defense witnesses and their testimony would have supported the main theory of the defense. While the jury might very well have rejected Harris's statements, as related by these witnesses, as untrustworthy, we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error", *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), and, therefore, "it is impossible to conclude that substantial rights were not affected." *Id.*

■ This conclusion applies not only to Harris, but to Mamone as well. The federal courts follow the bilateral approach to conspiracy, *see United States v. Rosenblatt,* 554 F.2d 36, 38 n. 2 (2d Cir.1977), under which unless at least two people commit the act of agreeing, no one does. *Id.* at 38. Accordingly, the district court charged the jury: "Since the conspiracy alleged here involves only two people and

since it takes two to conspire, if you find one defendant not guilty of this conspiracy, you must also find the other defendant not guilty." Under these circumstances, Mamone's fate was linked to Harris's, and the erroneous exclusion of the proffered testimony was no less harmless as to him.

Furthermore, although the instant indictment so charged, this was not a case like *United States v. Artuso*, 618 F.2d 192, 197 (2d Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980), where there was evidence from which the jury could rationally have convicted Mamone of conspiracy with "others unknown". Both the district court and the government apparently recognized this, for Count One was not submitted to the jury on the "others unknown" theory, and the government did not except to the charge as given.

Consequently, the convictions of both Harris and Mamone on Count One must be reversed and remanded for a new trial.

## D. *Defendants' Remaining Claims*

In view of the conclusions we have already reached, we can dispose briefly of defendants' remaining claims.

1. Harris argues that evidence of his previous narcotics dealings with Steward was inadmissible under Fed.R.Evid. 404(b). Because in our view the government's case was legally *sufficient* on Count One *without* this evidence, and legally *insufficient* on Count Two even *with* it, the issue is inconsequential insofar as this appeal is concerned. However, since there may well be a retrial on Count One, a few comments are in order.

At the beginning of his direct examination, Steward testified, over objection, that he supplied Harris with two and one-half to three kilograms of heroin between spring 1980 and January 1981. At the request of counsel for Mamone, the district judge instructed the jury that "You can only consider this testimony at this point against Mr. Harris and not against Mr. Mamone." Counsel for Harris then sought a further limiting instruction:

At this time we would ask for a limiting instruction with regard to the charges in this matter which are conspiracy. This is outside the time of the conspiracy. The jury should be instructed that this does not have anything to do with the conspiracy. It is background information.

This request was denied.

■ Under the "inclusionary" approach to Rule 404(b) followed by this circuit, *see, e.g., United States v. Levy*, 731 F.2d 997 at 1002 (2d Cir. Jan. 31, 1984); *United States v. Figueroa*, 618 F.2d 934, 938–44 (2d Cir. 1980); *United States v. O'Connor*, 580 F.2d 38, 40 (2d Cir.1978), evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity. Thus, in numerous conspiracy prosecutions this court has permitted the government to use similar act evidence to inform the jury of the background of the conspiracy charged. *E.g., United States v. Knuckles*, 581 F.2d 305, 314 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Moten*, 564 F.2d 620, 628 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977); *United States v. Magnano*, 543 F.2d 431, 435 (2d Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977); *United States v. Araujo*, 539 F.2d 287, 289 (2d Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976); *United States v. Torres*, 519 F.2d 723, 727 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975).

■ The similar act evidence introduced in this case does not fall squarely within these precedents, since the conspiracy charged was between Harris and Mamone, and the background information concerned Harris's relationship with Steward. However, a district judge has broad discretion in deciding whether to admit similar act evidence, *United States v. Knuckles, supra; see United States v. Smith*, 727 F.2d 214 at 219–20 (2d Cir.1984), and under the circumstances present here, we do not consider it to have been an abuse of discre-

tion for the district judge to admit this testimony, which, if nothing else, tended to show the basis for Harris's trust of Steward. *Cf. United States v. Moten, supra.*

■ On the other hand, it was error for the district court to refuse to instruct the jury that it could use the evidence of other acts only for the purpose for which it was offered and not as an indication of criminal propensity. *United States v. Levy, supra,* at 1002. In the event of a retrial, therefore, should the government seek to introduce evidence of this nature, the district judge must give such a limiting instruction if one is requested.

2. Because we have concluded that the evidence was insufficient to support defendants' convictions on Count Two, we need not consider defendants' additional claims that (a) Count Two was impermissibly vague and multiplicitous, and (b) they were prejudiced by the timing of the change in Count Two included in the superseding indictment.

3. We have also considered defendants' claims that (a) the indictment should have been dismissed because the government relied excessively upon hearsay before the grand jury, and (b) the district judge erred in instructing the jury as to reasonable doubt, but find them to be without sufficient merit to warrant discussion.

## III. CONCLUSION

Count One is reversed and remanded for a new trial. Count Two is reversed and dismissed.