Henry Lee Mitchell was indicted for attempting to traffic in cocaine, in violation of § 13A-12-231 and § 13A-4-2, Code of Alabama 1975. The jury found the appellant "guilty as charged in the indictment." The trial judge sentenced the appellant to life imprisonment in the state penitentiary, pursuant to the Habitual Felony Offender Act. The appellant was ordered to pay a $250,000 fine and a $25 assessment to the Crime Victims' Compensation fund.
The appellant contends that the State failed to prove a prima facie case to sustain his conviction for attempting to traffic in cocaine. Specifically, the appellant argues that his motion for judgment of acquittal should have been granted.
 "When a motion for a judgment of acquittal before submission of cause to a jury is made on the grounds that the state has failed to make out a prima facie case because the evidence is insufficient to support a finding of guilty beyond a reasonable doubt, it is the duty of the trial court to determine the sufficiency of the evidence to sustain a conviction under the indictment. In determining if the evidence of the state is sufficient to sustain a verdict, the trial court should consider only the evidence before the jury of the facts at the time the motion was made, and must consider it most favorably to the state. When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit the case for the jury to determine the weight it will give the evidence. . . ."
Sullivan v. State, 441 So.2d 130, 135 (Ala.Cr.App. 1983).
Because sufficiency of evidence is challenged, we will give a detailed recitation of the facts.
On September 16, 1988, members of the West Alabama Narcotics Squad began a drug investigation of Charles "Chuck" Means and this appellant. The agents set up an undercover operation in room 145 at the Holiday Inn in Tuscaloosa, Alabama. The agents used room 143 in the Holiday Inn to monitor the activities in room 145. They used Craig Taylor, a police officer from the Columbus, Mississippi, Police Department, as a seller in the undercover operation.
At about 6:11 p.m. on September 16, 1988, Taylor received a call in room 145 from a person who identified himself as Chuck Means. During this conversation, Means told Taylor he and the appellant wanted to come by and sample the cocaine.
Taylor received another call from Means at 7:55 p.m. A meeting was set up for room 145 at the Holiday Inn. Means and the appellant arrived at room 145 at approximately 8:00 p.m. During the meeting the appellant stated that they had been buying kilos and wanted to know how much a kilo of cocaine would cost. Means stated that the appellant was the one who tested the cocaine and that, if he approved, they would buy the cocaine.
Means and the appellant received a sample of the cocaine from Taylor. They were to test the cocaine and then contact Taylor and tell him whether they were satisfied with the sample. Means and the appellant took the sample, but did not contact Taylor again. The operation was shut down at about 11:00 p.m.
Mittford Tubbs, one of the officers who participated in the undercover operation, contacted Agent Eldon Willingham of the Alabama Bureau of Investigation several days after September 16, 1988. Tubbs was attempting to set up another undercover operation to apprehend the appellant. The *Page 740 
same day that Tubbs contacted Willingham, he asked Willingham to telephone the appellant and to inquire whether the appellant wanted to purchase cocaine. When Willingham telephoned the appellant, Willingham acted as if he were Taylor, since the appellant and Taylor had had a previous drug deal on September 16, 1988.
Willingham called the appellant on seven separate days between October 5, 1988 and November 3, 1988, discussing a possible drug transaction. The testimony at trial concerning the October 5, 1988, conversation was as follows:
 "Q Now, if you would, just tell us what was said on the 5th and whether or not that was recorded.
 "A It was not recorded. I called him from a telephone — a pay phone on Skyland Boulevard across from Shelton State Community College. I asked him what was going on and if he was still interested in some merchandise. Mr. Mitchell stated that he was interested and that they were ready to deal the previous night, that the money was ready. He wanted to do the deal right then that day and I told him I would be unable to. I told him I was in Louisiana. He wanted a telephone number where he could call me back. I told him I was unable to give him one; that I didn't give out my telephone number. I told him that I preferred having a number that I could call if I could. He said, 'Well, just call me back tomorrow morning early,' and that he would find out exactly how much they wanted. So I told him I talk to him the next day. And I asked him before he hung up, I said, 'How much are y'all dealing up there?' He said, well, sometimes they deal five ounces, sometimes nine or ten, sometimes fifteen ounces a day. So I said, 'Well, that's what I need. If it's going to be a steady thing, I'll call you back.'
 "Q Was there any conversation at that time about price for a kilo?
 "A Yes. He wanted to know a price I'd give him. I said, 'Well, if you're buying a few ounces, it would be approximately nine-hundred dollars an ounce. If you want a whole kilo, it would be around nineteen-thousand dollars.'
 "Q Did that pretty much terminate the conversation?
"A Yes, sir." (R. 90-1.)
The next conversation between Willingham and the appellant took place on October 6, 1988. During direct examination of Willingham, the following occurred:
 "A The next morning I went to the West Alabama Narcotics Squad Office about 8:30 and telephoned that same number and spoke with Henry Lee Mitchell again. He said — his words were, 'The man wants twenty.' And I said, 'All right. That will be nine-hundred each for twenty of them.' I said — he wanted a phone number. He said, 'Give me a phone number where I can call you.' And again I told him I was unable to give him a number; that I preferred to be calling back if I could; for him to give me a number. And he said, 'Well, just call me back at my house at 11:00 o'clock and I'll go get him and I'll have him over here so you can — we can work out the details.'
 "I called him back at probably 11:05 and he said he had not made contact with the man yet; that he lived on one side of the river and the man lived on the other side of the river across town and that he had some cows and his cows were out and he'd gone to see about them. He said call him back around later that evening.
 "I called him back at 5:30 and he still hadn't got in touch with him. I — He said that I needed to call back, that he, you know, he would be able to get in touch with him. He said, 'I know this guy wants twenty.' But he said there's one other man he needs to talk to who they usually get their source from that wanted — probably would want additional weight. So I said, well, you just need to find out and let me know. And he said, 'Well, you know, you probably need to come in town and stay two or three days. That's the way we usually do it around here. Nothing moves fast.' He said, 'Call me back at this number and if I'm *Page 741 
not here, it will be my mother on the telephone. Just leave a message with her.'" (R. 92-3.)
During cross-examination of Willingham, the following was elicited concerning the October 6, 1988, conversation.
 "Q And then as we have heard you testify and as we've heard on the tape, you called at 8:32 or approximately 8:32 the next morning on the 6th and he told you the dude wanted twenty, and he said, 'I'm going to get your phone number and let him call you.' Isn't that correct?
"A Yes.
 "Q And another time during that conversation that started at 8:32 on the 6th of October, he said, 'I'm going to let you talk to him,' and without specifying who him — who this other party was.
"A Yes, sir.
 "Q And then you talked to him next at 11:05 the same morning.
"A Yes, sir.
 "Q And at that time he said, 'He'll have the money here.' That's in response to your concern about the money.
"A Yes.
 "Q And that's when you're talking about whoever the third party is who hasn't been identified at this point in time, but it's pursuant to your request that the third party be at Henry Lee's house so you can talk to him. Isn't that correct?
"A Yes.
 "Q Okay. Now, then you next talked to him at 5:30 that evening.
"A Yes.
 "Q All still on the 6th. And Henry Lee tells you at that time: 'He said he can do it tomorrow. He will be here about 12:00 o'clock and you can talk to him.' Isn't that —
"A That's right.
 "Q That's right. That was because that day we had the problem with the cows that he couldn't talk to you.
"A Yes, sir.
 "Q All right. And he says to you with reference to you talking to this third party: 'You can explain to him how you want to do it.' Do you recall that?
"A Yes, sir.
 "Q And isn't it fair to say that how you want to do it, that was to discuss the terms of the transaction?
"A Yes, sir.
 "Q Isn't that correct? At this point on the 6th, we understand we're discussing a twenty-ounce transaction.
"A Yes, sir.
 "Q And that's because at 8:32 — the beginning of the morning — Henry Lee told you, said words to the effect: The dude said he wanted twenty.
"A Yes, sir.
"Q Okay. And we're talking about twenty ounces.
"A Yes, sir." (R. 120-22.)
On October 7, 1988, Willingham attempted to telephone the appellant, but he was not at home. Willingham left a message with the appellant's mother.
Willingham called the appellant on October 12, 1988. Willingham testified as to the contents of that conversation:
 "Q Moving on now to the next time that you called Henry Lee Mitchell's residence at his phone number.
"A That was October the 12th.
"Q Tell us about that.
 "A I was in Ft. Lauderdale, Florida, attending a school and I telephoned him. I just told him, I said, 'I'm in Florida — Ft. Lauderdale — right now. I'm getting ready to make a run. I couldn't get in touch with you the other day because of Homecoming and everything.' And he said, 'Well, everybody still wants to deal. When you get closer up this way, give me a telephone call.' I said okay.
"Q Did you give him a phone number that time?
 "A Yes, sir. It was a pay phone number at a — I went downstairs to the Howard Johnson's on highway 181 there in Ft. Lauderdale and I give him the phone number right there next to the lounge.
 "Q But that was a Florida number where you actually were in case he did call. *Page 742 
"A Yes." (R. 95-6.)
Willingham next talked to the appellant on October 25, 1988.
 "Q When, then, is the next time that you talked with Henry Lee on the phone?
"A October the 25th.
 "Q Could you tell us about that one: where you were and what was said so forth?
 "A I telephoned him from the West Alabama Narcotics Squad and told him I was getting ready to come back up, make a run back through his area. And he told me that it wasn't nothing much happening right then. He said he wasn't doing nothing. He said, 'But give me a call.' He said, 'You need to come in and stay a few days. Everything moves slow around here'; said, 'You need to come into town and stay two or three days and get something started.' I told him that was too dangerous, you know, to be riding around with that much cocaine for a period of time. He said, 'Well, that's just the way we do it up here.'
 "I said, 'Well, what happened the night you got the sample from me? Did you like it?' He said, 'No, it was okay.'
 "Q Excuse me; let me stop you. Which sample are you talking about?
 "A I was referring back to the 16th. "Q That was gotten at the Holiday Inn from Craig Taylor?
 "A Yes. "Q Okay. Go ahead.
 "A I said, 'What was wrong with that sample you got.' He said, 'Nothing, it wasn't nothing wrong with it.' I said, 'Well, what happened? The reason you didn't come back that night?' He said, 'Well, the main man come into town with a kilo and they went ahead and got the kilo.' I repeated everything back to him. I said, 'Oh, so you liked our sample, no problem with it, but somebody else came in. The main man came into town with a kilo and you got it. That lost me not being able to do my deal.' He said, 'That's correct.' And I said — he said, 'Well, when you get back up this way, just give me a call.' I said, 'Well, I'll be coming through there in a few days and I'll call you next week.'" (R. 96-7.)
On October 31, 1988, Willingham called the appellant again. The testimony of Willingham about that call is as follows:
 "Q When is the next time that you talked with Henry Lee Mitchell on the phone?
"A October 31st.
"Q Tell us about it.
 "A I called him and told him I was in the area and that I would be passing through. He said he was homesick. I asked — I said, 'Have you got a number I can call and talk to the people you've been telling me about?' He said, 'Well, you just call me when you get in town.' I said, 'Okay, you'll be hearing from me.' And that was the end of that conversation." (R. 98-9.)
The last of the telephone communications was on November 3, 1988. The following occurred during direct examination of Willingham:
"Q Okay. All right. Did you call him back again?
"A November 3rd.
 "Q Were there several conversations on November 3rd with him and others?
"A Yes, there was.
 "Q Okay. Tell us about the first conversation that you had on the 3rd: where you were, what was said, and with whom you were talking.
 "A November 3rd I was with the West Alabama Narcotics Squad office. I called him at approximately 2:30 p.m. and told him I was in Birmingham. I said, 'What's going on?' His words were, 'Everything's lovely. I got a man — I talked to the main man's runner last night.' He termed it: 'They want a whole man.' And I asked him to repeat. I said, 'They want what?' He said, 'They want a whole man. They want a kilo.' I said, 'No problem.' I said, 'Who do I need to call?' He said, 'When you get in Tuscaloosa, give me a call.' I said, 'Well, I'll call you in about an hour.'
 "I called him about an hour later and told him I was in Tuscaloosa. Henry Lee told me that he had not talked with the *Page 743 
man since he had talked with me. He said, 'But I'm going to give you his beeper number. You call this beeper number and tell him that I said to call and you ask for Charles.' So I said all right. So I called back just a few minutes later and I asked him again; I said, 'This beeper number: is it a digital beeper or a voice beeper?' He said it's a digital beeper. He said you call it and punch in the number you want him to call back and he'll call you back.
 "We tried the beeper, I think, twice and didn't get no response. At around 5:00 o'clock I called Henry Lee Mitchell back and I said, 'I've called this number. I'm not getting no response.' And he said, 'Well, they were out late all night last night. They're probably still asleep. They won't get up till late. Just call back later and everything will be fine.' So I said all right. I went on to my residence." (R. 99-100.)
Willingham gave the beeper number to Agent Tubbs. Tubbs called the beeper number and left Willingham's number as the return number.
Charles Milligan called Willingham back, and during this conversation, Milligan stated that he wanted to buy a kilo of cocaine. Willingham told him it would cost $18,000.
They arranged a meeting at the Hardee's restaurant in downtown Tuscaloosa, so that Milligan could sample the cocaine. Paul Johnson, an agent with the ABI, was to meet Milligan at the Hardee's restaurant and give him the sample.
Milligan and Robert Earl Harris came to the Hardee's restaurant where Johnson met with them briefly. At a second meeting with Johnson, Milligan and Harris got the sample of cocaine. Later, Milligan called Willingham and said he was satisfied with the sample and that he wanted to purchase a kilo of cocaine. They then arranged for a meeting at the Holiday Inn in Tuscaloosa, where Milligan and Harris were to purchase a kilo of cocaine for $18,000.
Milligan and Harris drove to the Holiday Inn at approximately 9:40 p.m. They showed Agent Johnson the money. Milligan and Harris were subsequently arrested and taken into custody.
The appellant was arrested at Chuck Means's home on November 4, 1988.
Count I of the indictment reads as follows:
 "The Grand Jury of said County charge that before the finding of his Indictment, HENRY LEE MITCHELL, alias HENRY L. MITCHELL, alias HENRY MITCHELL, whose name is otherwise unknown to the Grand Jury, did, with the intent to commit the crime of Trafficking in Cocaine, on, to-wit: November 3, 1988, in violation of Section 13A-12-231 of the Code of Alabama, attempt to unlawfully possess a controlled substance, to-wit: cocaine or of any mixture containing cocaine, in a quantity of 2.2 pounds or more, but less than 22 pounds, in violation of Section 13A-4-2 of the Code of Alabama."
According to § 13A-4-2(a), Code of Alabama 1975, "[a] person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense." Applying this definition to this case, therefore, the State must establish (1) that the appellant had the specific intent to possess cocaine, and (2) that the appellant performed an overt act for the purpose of gaining possession of the cocaine. Also, three elements must be proven to show possession: (1) actual or potential control, (2) intention to exercise dominion and, (3) external manifestation of the intent to control. See Donahoo v. State, 505 So.2d 1067
(Ala.Cr.App. 1986). The State may prove either actual possession or constructive possession. Scrafford v. State,414 So.2d 179 (Ala.Cr.App. 1982).
In United States v. Harris, 733 F.2d 994 (2d Cir. 1984), Harris acted as a broker for a potential seller and a potential buyer. Harris had several telephone conversations with Steward, an undercover government informant, concerning a possible drug transaction. Harris negotiated the deal between Mamone, a codefendant who sought to sell heroin to the undercover informant. *Page 744 
Later, Mamone contacted the undercover informant and they arranged to meet at a specified place. The deal never was completed. Harris was convicted of attempt to possess heroin with intent to distribute. The United States Court of Appeals for the second circuit reversed Harris's conviction. The court stated: "The government's case pictured Harris as a broker and Mamone as the supplier of heroin. As a broker in the transaction, however, it simply was not necessary for Harris to ever possess any heroin, either actually or constructively, or to attempt to do so."
For the appellant's conviction to be affirmed for anattempt to possess drugs,[1] there must be some evidence in the record that the appellant maintained dominion and control over the illegal substance or attempted to maintain dominion and control. In Di Sangro v. State, 422 So.2d 14 (Fla.Dist.Ct.App. 1982), the appellant was convicted of attempted possession of valium. There was no evidence that the appellant exercised dominion and control over the drugs; therefore, his conviction was reversed. In Daudt v. State, 368 So.2d 52 (Fla.Dist.Ct.App. 1979), the appellant's conviction for possession of marijuana was reversed where the evidence showed that the appellant brought a buyer and a seller together. Although the appellant was to be paid for his service, there was no evidence that the appellant had either constructive or actual possession of the marijuana.
In the present case, the facts clearly indicate that this appellant acted as a broker for the drug transaction. This appellant was not present when Johnson gave Milligan a sample of cocaine to test. This appellant was not present on November 3, 1988, at the Holiday Inn, where the drug transaction was to occur. There is no evidence that the appellant had actual or constructive possession of the cocaine referred to in the indictment or attempted to maintain possession of it. There is no evidence in the record the appellant intended to possess the cocaine or did an overt act for the purpose of gaining possession of it. We find that although the appellant acted as a broker and connected a willing seller and a willing buyer together, there was no evidence presented to support the appellant's conviction that he attempted to possess cocaine in excess of 2.2 pounds.
For this reason, the trial court should have granted the appellant's motion for judgment of acquittal. Therefore, this cause is due to be, and it is hereby, reversed and a judgment is rendered for the defendant.
REVERSED AND JUDGMENT RENDERED.
All the Judges concur.
[1] We find no Alabama cases directly on point.