951 F.2d 474
 34 Fed. R. Evid. Serv. 1224
 UNITED STATES of America, Appellee,
v.
Carl CARDASCIA; Ronald Martorelli; Gabriel Peluso;
Anthony DelVecchio; Jilly Rizzo; Donald Sheppard; Marc
Bateman; Donald Laauwe; Frank Nigrelle; Stephen Metz;
Grace Celentano; Vincent Ciarlone, Defendants,
Carl Cardascia; Marc Bateman; Ronald Martorelli; Donald
Sheppard and Jilly Rizzo, Defendants-Appellants.
 Nos. 108-112, Dockets 90-1541, 90-1721, 91-1037, 91-1039 and
91-1040.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 26, 1991.
Decided Dec. 5, 1991.
 
 John Apicella, Brooklyn, N.Y., for defendant-appellant Carl Cardascia.
 John H. Doyle, New York City (Jordan W. Siev, Carol Schlitt, Anderson Kill Olick & Oshinsky, P.C., of counsel), for defendant-appellant Marc Bateman.
 Dominic F. Amorosa, New York City, for defendant-appellant Jilly Rizzo.
 Paul Brenner, New York City, for defendant-appellant Ronald Martorelli.
 Susan Corkery, Asst. U.S. Atty. E.D. New York, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., Emily Berger and Virginia Evans, Asst. U.S. Attys., Steven M. Gold, Sp. Asst. U.S. Atty., of counsel), for appellee U.S.
 Before OAKES, Chief Judge, FEINBERG and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal reveals delineated plans in which different individuals in their haste to get rich committed numerous frauds and misapplied bank funds. Appellants are swindlers who created sham schemes and the bank officers who received commissions under-the-table for loaning the bank's money to them. In doing so they proved the truth of Samuel Johnson's dictum: "Avarice is a uniform vice ... to the favour of the covetous there is a ready way, bring money and nothing is denied." S. Johnson, The History of Rasselas, XXXIX (Oxford Univ. Press). Appellants' greed blinded them to the fact that their grandiose designs were so transparent it was obvious they would be easily seen through. We turn to examine in some detail the two conspiracies upon which appellants were convicted and the roles they and others who participated played.
 
 BACKGROUND
 
 2
 Carl Cardascia, Marc Bateman, Ronald Martorelli, Jilly Rizzo, and Donald Sheppard (appellants) were all convicted in the United States District Court for the Eastern District of New York (Weinstein, J.), after a lengthy and complicated jury trial, for conspiracy, fraud, and false statements in connection with loans made by a Queens, New York savings and loan institution. A 64-count indictment charged 12 defendants variously with conspiring to commit offenses in violation of 18 U.S.C. § 371 (1988) (conspiracy), § 1341 (mail fraud), § 1343 (wire fraud), §§ 1006 and 1014 (false statements), and 18 U.S.C. § 657 (1988) (misapplication of bank funds).
 
 
 3
 The five appellants were found guilty by the jury on April 4, 1990 as follows: (1) Cardascia of two conspiracy counts, five mail fraud counts, 22 misapplication of bank fund counts, four false statement counts, and one count of illegal participation of a bank officer in a false statement; (2) Bateman of one conspiracy count and one false statement count; (3) Martorelli of two conspiracy counts, four wire fraud counts, four misapplication counts, one mail fraud count, and one false statement count; (4) Rizzo of one conspiracy count, five misapplication counts, and two false statement counts; and (5) Sheppard of one conspiracy count, one false statement count, and one mail fraud count. Judgments of conviction were entered against each appellant on August 24, June 20, December 5, June 20, and November 15, 1990, respectively.
 
 
 4
 Cardascia was sentenced to concurrent two year terms on all counts, fined $669,000, with all but $100,000 suspended, and ordered to make restitution in the amount of $7.9 million, also suspended. Martorelli was sentenced to concurrent five year terms, which were suspended, given two years probation, six months of which are to be served in a community treatment facility, and fined a $350 special assessment. Sheppard's and Bateman's two and five year sentences were suspended, and each received a probationary term requiring 300 hours of community service. Sheppard was assessed $50; Bateman was fined $40,000 and $5,000 on the two counts for which he was convicted. Rizzo's sentence was similar to Martorelli's, except that his fine was $285,000, plus a $150 assessment. Cardascia is presently serving his sentence. The sentences of the other four appellants have been stayed pending this appeal.
 
 
 5
 In addition to these five appellants, a sixth defendant, Anthony DelVecchio, was convicted but has not appealed. Three of the six remaining defendants--Gabriel Peluso, Stephen Metz, and Frank Nigrelle--pled guilty before trial; the prosecution of the other three defendants--Donald Laauwe, Vincent Ciarlone, and Grace Celentano--was deferred (these seven defendants are hereafter referred to as defendants to distinguish them from appellants). Three other primary players in the two conspiracies--Lawrence Formato, George Livieratos and Michael Rapp--cooperated with the prosecution, were not indicted, and appeared as the government's chief witnesses (referred to hereafter as witnesses).
 
 
 6
 The charges involved two different conspiracies sharing many of the same defendants and involving the same bank, the Flushing Federal Savings and Loan Association of Queens, New York (bank or Flushing Federal), where appellant Cardascia was president and appellant Martorelli assistant vice-president. In prosecuting this matter, the government called 35 witnesses and introduced hundreds of documents during the 40-day trial.
 
 A. The Joint Venture
 
 7
 In the first or joint venture conspiracy a group of business partners obtained multi-million dollar loans fraudulently from Flushing Federal, ostensibly to develop property in Pennsylvania. The business venture was a sham. The seven partners in this venture were appellants Bateman, Sheppard and Rizzo, witnesses Formato and Livieratos, and defendants DelVecchio and Peluso (hereafter partners). The conspiracy developed as follows: In late 1982 or early 1983 appellant Bateman, an attorney, contacted witness Formato and proposed that Formato and Livieratos, as officers of World Wide Ventures, Inc. (World Wide), a holding company of various enterprises for which appellant Sheppard served as corporate secretary, enter a joint venture with Bateman, appellant Rizzo, and defendant Anthony DelVecchio, the latter two being the owners of Jilly's Enterprise. The sole asset of Jilly's Enterprise was a piece of undeveloped land in the Poconos region of Pennsylvania (the Poconos property). Rizzo and DelVecchio needed financing in order to convert the property to a profitable use. Shares of stock in World Wide were exchanged for an interest in the Poconos property, which was estimated to be worth $300,000 at the time. With a projected $300,000-$700,000 in seed money, and needing an estimated $30-50 million dollars to complete the project, the partners purportedly planned to develop the Poconos property into a hotel, casino, and sporting resort complex.
 
 
 8
 The group first sold one million shares of World Wide stock while holding promotional media events in an effort to inflate its price. They also obtained two small loans from the Pilgrim National Bank, but these funds were not used to develop the property and were spent instead on the partners' personal expenses. In their search for additional capital, the partners were introduced to defendant Gabriel Peluso and, in turn, his friend appellant Carl Cardascia, president of Flushing Federal. Hoping ultimately to procure $50 million in financing, the partners arranged for a $5 million loan from the bank, but received only $500,000 due to limits on the amount Cardascia could personally approve. Although defendant Peluso originally demanded a 20 percent commission, or $1 million, to split with Cardascia, the partners eventually agreed to transfer 1 million shares of World Wide stock instead.
 
 
 9
 After approving the loan, appellant Cardascia instructed the partners to get an appraisal of the Poconos property at as high a figure as possible, to serve as "window dressing" in the event the loan files were examined by government auditors. The appraisal and other documents were to be delivered to appellant Ronald Martorelli, assistant vice-president of the bank. Cardascia, knowing the property was worth only $300,000, intended that the Poconos property would serve as the collateral for the $5 million loan. Appellant Sheppard, as the corporate secretary of World Wide, produced some loan documents for Martorelli, but he and the other partners were unable to obtain the inflated appraisal until attorney Bateman managed to get from defendant Donald Laauwe, a licensed real estate broker, an appraisal valuing the property at $6.5 million, for which Laauwe was paid a $1,000 fee. This value was ascribed to the Poconos property despite the lack of any zoning permits or construction approvals for the huge development ostensibly planned. Further, the so-called appraisal did not contain a legal description of the property, tax value information, sales figures for comparable property, or its highest or best use value. Defendant Laauwe's appraisal failed to conform to professional standards in so blatant a manner that no bank could consider the document acceptable for loan purposes. The appraisal eventually was forwarded by witness Formato to appellant Martorelli--who asked no questions--and said it was needed purely as a formality to complete the file.
 
 
 10
 The $5 million line of credit was conditionally approved on March 7, 1984 and the partners closed the transaction at Flushing Federal on March 23, 1984. The bulk of the proceeds from the initial $500,000 payment had been dispersed among the partners for their personal use. On May 16, 1984 witness Livieratos initiated the transfer of 500,000 shares of World Wide, then worth $2.50 per share, to appellant Cardascia and defendant Peluso. These shares were in turn distributed to various assignees, including Cardascia's wife, using her maiden name. Soon after the transfer of the stock, the bank approved a second installment of the loan--this time $100,000--for witnesses Formato and Livieratos without requiring any financial statements, credit history, accounting of the original installment, or progress report on the property's development. To facilitate the disbursement, appellant Martorelli crudely altered the original mortgage of the Poconos property to reflect the new $100,000 installment. After applying a small portion towards interest on the March loan, the partners spent the balance.
 
 
 11
 By September of 1984 appellants Martorelli and Cardascia had loaned $880,000 to shell corporations set up by the partners so that they could avoid personal liability and because the bank was limited to lending only to New York corporations. In addition, witness Formato obtained a $300,000 loan intended for furthering the Poconos property project, despite a municipal planning board rejection of the project due to inadequate sewerage capacity and a limited approval for only one small cluster of condominiums. Appellants Martorelli and Cardascia accepted some restricted stock from World Wide to serve as partial collateral for these loans. The proceeds from both loan transactions were eventually directed towards repayment of the World Wide May 1984 loan principal and personal expenses of the partners.B. The Nominee Loans
 
 
 12
 The second conspiracy involved five individuals--appellant Rizzo, defendants DelVecchio and Peluso, witnesses Rapp and Formato--who conspired with appellants Cardascia and Martorelli to obtain $7.5 million in illegal "nominee loans" from the bank. The loans exceeded the bank's lending restrictions and were obtained in exchange for commissions paid Cardascia, its president. The conspiracy developed in the following fashion: After the Federal Home Loan Bank Board (Federal Bank Board) gave Flushing Federal a poor rating, the bank was subjected to escalating scrutiny that revealed ongoing regulatory violations. Finally, after a meeting was held with the bank's board of directors, the Federal Bank Board imposed a supervisory agreement on Flushing Federal to address four problem areas: rapid growth, questionable underwriting practices, large loans, and brokered deposits. Brokered deposits are deposits brought to the bank by a third party in exchange for which the bank pays a commission. The Federal Bank Board instituted a number of lending restrictions and the bank assigned appellant Martorelli to insure that loan files were in order, which in this case was akin to placing the fox in charge of security for the chicken coop.
 
 
 13
 In obvious disregard for the supervisory agreement and lending restrictions, Cardascia solicited $5 million in brokered deposits in July of 1984 from unindicted witness Rapp, who was introduced to the bank president by witness Formato, appellant Rizzo, and defendant DelVecchio. Cardascia agreed to authorize a $1.25 million unsecured loan for Rapp as a commission for directing the deposits to Flushing Federal. Rapp, who had disclosed to Cardascia his criminal background, protected witness status, the debts he owed to the Internal Revenue Service and a Florida bank amounting to nearly $1 million each, and the fact that he had authored the book "The Wall Street Swindler," told the bank's president--obviously with tongue in cheek--that he intended to use the loan for venture capital.
 
 
 14
 When the Federal Bank Board notified Flushing Federal on August 16, 1984 that the bank had abridged the supervisory agreement, Cardascia replied in a letter dated September 18, 1984 that no new brokered deposits would be accepted and the bank would comply with the agreement. Even before this reply was mailed, Cardascia had approved additional loans in exchange for a $50,000 payoff from witness Rapp. A promised loan of $450,000 for defendant DelVecchio was expedited and Rapp obtained an additional $300,000 for a shell corporation under his control. A significant portion of these proceeds again were spent on personal expenses and debts of the borrowers.
 
 
 15
 Cardascia soon became reluctant to deal with the borrowers, suspecting that witness Formato and his World Wide associates would renege on their obligations. In order to gain renewed access to Cardascia, witness Rapp promised a 10 percent finders fee to defendant Peluso, promised Cardascia that he would cover the World Wide loans, and directed a devious $100,000 payment to Cardascia that was sent by courier from Rapp in Florida to appellant Rizzo at a New York City jewelry store, and passed from there to Peluso, who took the money personally to Cardascia.
 
 
 16
 At this point, the World Wide Poconos property joint venture dissolved. Appellant Rizzo and defendant DelVecchio assumed the Flushing Federal loans and World Wide relinquished its interest in the Poconos realty. In exchange for the $100,000 payoff from Rapp, Cardascia approved $2.5 million in new loans for Rapp nominees, purportedly to be used on his proposed capital ventures, including a fish processing plant, a diet center franchise, a hotel and casino, a travel agency, oil and gas leases, and a bank purchase. All this money was advanced to the person who literally "wrote the book" on swindling. Stock from corporations owned by new nominees was used to secure portions of the new loans. Although the nominees were needed, in part, because Cardascia was limited to a personal approval rate of $375,000 per loan, loans exceeding these limits were extended on October 26, 1984 to defendant DelVecchio, witness Rapp and appellant Rizzo, who fraudulently completed loan documents in the course of procuring them.
 
 
 17
 In early November 1984, appellants Martorelli and Cardascia became concerned about the appearance of the loan files at Flushing Federal and the amount of unsecured loans approved during the previous four months. Martorelli sent Cardascia a confidential status report outlining the payment schedule, documentation status, and collateral levels for the loans, the status of the Poconos property development, and notice that appellant Rizzo and witness Formato had defaulted on loan payments. As a result, the two bank officials sought from the partners additional collateral in order to placate the federal regulators who the bank officers knew would eventually audit the files. Before additional collateral could be obtained, witness Rapp produced new nominees and obtained $1.425 million in new loans, approved by Cardascia and processed by Martorelli. In what had now become a regular routine, the documentation required by Martorelli was negligible, Cardascia requested his usual bonus for approval, and the borrowers spent the proceeds on personal expenses.
 
 
 18
 On December 11, 1984--this time purportedly to procure additional collateral--Cardascia approved $700,000 in loans for new Rapp nominees. Passbooks representing accounts held by an offshore bank were assigned to Flushing Federal to cover the $8 million in outstanding loans extended to Rapp nominees; the accounts later lapsed before payments on the loans became due and, hence, were totally worthless as collateral. On December 17, 1984 Rapp, Peluso, DelVecchio, Rizzo, Cardascia, and Martorelli met at a New York restaurant and falsified documents intended to predate the collateral assignments for the passbooks that were not theirs. At the same time, Cardascia and Martorelli extended new nominee loans for an amount of $575,000. Shortly after Rapp gave Cardascia and his wife matching watches for Christmas, the bank president extended another $1.2 million to Rapp and two new nominees. In sum, during the last six months of 1984 witness Rapp and his nominees obtained $7.5 million in loans from appellants Cardascia and Martorelli, $2.7 million was invested as venture capital by the borrowers, $1.35 million was directed toward brokerage fees for deposits made at Flushing Federal, and the balance (nearly half) was spent by the borrowers and co-conspirators on personal expenses.
 
 
 19
 The Federal Bank Board, with a team of auditors in tow, descended upon Flushing Federal on February 8, 1985. Their initial efforts to obtain certain bank reports were frustrated by Cardascia and Martorelli. These delaying measures prevented the auditors from obtaining a trial balance with respect to existing lines of credit that would have revealed the $7.5 million in loans secured by the off-shore passbooks and the now depreciated World-Wide stock. Shortly thereafter Martorelli sent Cardascia a letter of resignation accompanied by a memo outlining differences he had with the practices and procedures adopted by Flushing Federal. In turn, Cardascia revealed to the bank's board of directors the supervisory agreement violations of the past six months and resigned on April 2, 1985.
 
 ISSUES RAISED
 
 20
 Appellants Cardascia, Rizzo, Bateman, and Sheppard each assert on appeal that their motions for severance were improperly denied by the trial court after a pretrial hearing and, as a result, they were denied a fair trial. Sheppard and Bateman's claims are grounded on alleged spillover prejudice from the introduction of evidence relating to the Rapp nominee loan conspiracy, to which they were unconnected. Cardascia and Rizzo make related claims that their defenses were antagonistic and required severance to avoid a miscarriage of justice. Rizzo claims that Cardascia became a second prosecutor against him in efforts to establish a successful defense. Cardascia, on the other hand, argues that an irreconcilable conflict existed between the defenses of the defendants which warranted severance of his trial from the others. He argues further that the prosecution purposefully joined Martorelli as a codefendant to prevent Cardascia from calling the bank vice-president as a defense witness.
 
 
 21
 Appellant Martorelli additionally asserts that his resignation letter to Cardascia tended to show that he did not possess the mental state required to support a conviction and that refusal to admit the letter into evidence was erroneous and deprived him of a fair trial. Specifically, Martorelli asserts that the letter was relevant and admissible as evidence of his then present state of mind. He claims further that the trial court's reversal of its earlier decision to admit the letter caused prejudice to him because he had relied on the document's admissibility for much of the trial.
 
 
 22
 Beyond these two challenges, which we think have sufficient merit to warrant discussion, the five appellants assert on appeal a number of other errors allegedly committed during the prosecution of their cases. Specifically, Sheppard, Rizzo, and Cardascia argue, for different reasons, that the government failed to meet its obligation, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose exculpatory evidence that was material to the determination of their guilt. Appellants Rizzo and Bateman also assert there was insufficient evidence before the jury to support their convictions. Bateman contends he failed to receive effective assistance of counsel. After a hearing, the trial judge denied Bateman's motion for a new trial and held that trial counsel afforded him effective assistance. Rizzo states he was improperly charged with two conspiracies in violation of double jeopardy prohibitions and that government documents were erroneously admitted into evidence. Finally, Cardascia urges that the trial court improperly charged the jury with respect to the misapplication count. After careful consideration we conclude that, except for the questions just noted on severance and admissibility of the resignation letter, appellants' arguments lack sufficient merit to warrant discussion, and that all of appellants' convictions should be affirmed.
 
 DISCUSSION
 I Severance
 
 23
 The first issue to be discussed is whether there should have been a severance because the defenses offered by counsel for two defendants were antagonistic or because the trials for two defendants who played only minor roles in one conspiracy were joined with the trials of other defendants accused of a different conspiracy.
 
 
 24
 The decision to sever multi-defendant trials is committed to the sound discretion of the trial judge. See Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir.1989); Advisory Committee Note to Fed.R.Crim.P. Rule 14. Considered "virtually unreviewable," United States v. Friedman, 854 F.2d 535, 563 (2d Cir.1988), a denial of a motion to sever will not be reversed unless appellants establish that the trial court abused its discretion. See United States v. Potamitis, 739 F.2d 784, 790 (2d Cir.1984); United States v. Carpentier, 689 F.2d 21, 27 (2d Cir.1982). Rule 14 of the Federal Rules of Criminal Procedure provides that a trial court may sever multidefendant trials "[i]f it appears that a defendant or the government is prejudiced by the joinder of defendants in the indictment." An appellate court's ability to read the record cannot equal the trial court's perception not only of what is introduced and in what order at trial, but also the extent of the jury's comprehension of the evidence against each defendant. For these reasons, the burden on a defendant to establish that severance was improperly denied is not an easy one to carry. The defendant must establish prejudice so great as to deny him a fair trial.
 
 
 25
 The deference given by an appellate court to a trial court's severance decision reflects the policy favoring joinder of trials, especially when the underlying crime involves a common plan or scheme and defendants have been jointly indicted. Acknowledged in this policy is the inevitable tolerance of some slight prejudice to codefendants, which is deemed outweighed by the judicial economies resulting from the avoidance of duplicative trials. Further, the risk of inconsistent verdicts resulting from separate trials, and the favorable position that later tried defendants obtain from familiarity with the prosecution's strategy is obviated through multidefendant trials. See Richardson v. Marsh, 481 U.S. 200, 209-10, 107 S.Ct. 1702, 1708-09, 95 L.Ed.2d 176 (1987).
 
 
 26
 Here the appellants assert that severance was denied improperly on two distinct theories. First, Sheppard and Bateman argue that they suffered spillover prejudice as a result not only of the joinder of their trials but also because of the joinder for trial of the two separate conspiracies. Cardascia and Rizzo contend, on the other hand, that their trials should have been severed due to the mutual antagonism between their defense strategies. We discuss these arguments in order.
 
 A. Prejudicial Spillover
 
 27
 The trial involved the joinder of the five appellants and defendant DelVecchio and the joinder of the joint venture and nominee loans conspiracies. Appellants Bateman and Sheppard did not participate in any of the activity relating to the nominee loans conspiracy. They argue that due to the complex nature of the two conspiracies, the similarities shared by the schemes, and the minor roles each played in procuring the World Wide loan, the jury was unable to judge their guilt without improperly imputing to them some guilt due to their association with the co-defendants who were involved in both schemes.
 
 
 28
 The joinder of an unrelated conspiracy in the instant trial is an aggravated variation of the scenario presented when minor players in a conspiracy trial are joined with co-conspirators who played more significant roles. Here there are mitigating circumstances demonstrating that no substantial prejudice occurred. Despite their minor roles in the joint venture conspiracy, most of the evidence received relating to it would have been admissible had each of these appellants been tried separately. Evidence pertaining to the nominee loans, on the other hand, would have been irrelevant and inadmissible in such trials.
 
 
 29
 We recognize these appellants may have suffered some prejudice when they were forced to sit before the jury for over a month without any evidence being introduced concerning their activities. Nonetheless, a disproportionate introduction of evidence relating to joined defendants does not require a severance in every case. See United States v. Chang An-Lo, 851 F.2d 547 (2d Cir.1988) (severance denied on theory that separate trials not warranted despite evidence admitted against some defendants not being admissible against others); United States v. Carson, 702 F.2d 351 (2d Cir.1983) (same). Relief by severance may be more appropriate when the unrelated evidence reflects activities of a violent nature because the risk of substantial prejudice is greater. The unrelated evidence presented in the instant case revealed only another bank fraud scheme; disparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance. See Chang An-Lo, 851 F.2d at 557; Carson, 702 F.2d at 366. We therefore do not accept the "guilt by association" argument appellants advance, and do not believe Bateman and Sheppard were denied a fair trial.
 
 
 30
 The same appellants argue further that the joinder of the two conspiracies resulted in a trial too complex and lengthy to be fair. In Casamento, 887 F.2d 1141 (2d Cir.1989), we stated that the burden for establishing a reasonable basis for the joinder of trials should not shift to the prosecution unless the estimated trial time exceeds four months. Id. at 1151-52. There we held that defendants were not denied a fair trial despite the fact that the joint trial of major and minor defendants lasted 17 months, required the introduction of thousands of documents and 275 government witnesses, and spanned 40,000 pages of trial transcripts.
 
 
 31
 Moreover, careful review of the evidence by the jury after the trial judge had repeatedly instructed it to avoid spillover prejudice specifically militated against any substantial prejudice occurring with regard to Bateman and Sheppard. No fewer than six times when charging the jury the trial court instructed it to consider separately the evidence against each defendant and the counts with which he had been charged. Appellants fail to point to anything in the record to substantiate their claim that the jury instructions failed to limit the potential for prejudicial spillover. This case simply is not one where "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968) (testimony regarding a confession of one defendant admissible against that defendant but inadmissible against codefendant, a limiting instruction failed to protect against misuse by the jury against the co-defendant).
 
 
 32
 The jury verdict itself provides further support for the view that it carefully evaluated the evidence and fairly distinguished between the separate defendants when reaching its verdict. The jury requested numerous exhibits, charge clarifications, and that testimony be reread, and then returned a partial verdict, finding Bateman guilty of only two of 13 counts and Sheppard of only four of 16 counts. Such a verdict evinces the jury's separate weighing of the evidence against each defendant. See Casamento, 887 F.2d at 1150; Carson, 702 F.2d at 367. Consequently, appellants Bateman and Sheppard did not establish an abuse of the trial court's discretion in denying their motion for trial severance.
 
 B. Antagonistic Defenses
 
 33
 Appellants Cardascia and Rizzo contend that because of the conflict between their defenses, the trial court abused its discretion and denied them a fair trial when it refused to sever their trials. Cardascia argued to Judge Weinstein that at least three, if not four, trials should actually be held, one each for himself and Martorelli, and one for each of the two conspiracies. He alleged that he had been victimized by the codefendants and, as a result, was forced during his trial to prosecute them in order to reveal the fraud they had perpetrated upon him. Cardascia also urged that his trial be severed from Martorelli's because he claimed the government, in bad faith, had joined Martorelli as a codefendant for the sole purpose of eliminating him as a favorable witness for Cardascia's defense. Rizzo asserts that he was an innocent bystander who did not take part in the conspiracy, but was convicted solely due to the repeated attacks of Cardascia's counsel.
 
 
 34
 We recognize that antagonistic defenses may conflict to such a degree that codefendants are denied a fair trial. See, e.g., United States v. Serpoosh, 919 F.2d 835 (2d Cir.1990). It is not the mere existence of antagonistic defenses that prompts a required severance. Instead, the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before we will find such prejudice as denies defendants a fair trial. See United States v. Villegas, 899 F.2d 1324, 1346 (2d Cir.1990); Carpentier, 689 F.2d at 28; United States v. Berkowitz, 662 F.2d 1127, 1133 (5th Cir.1981). Defenses are mutually exclusive or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant. The trial judge should order a trial severance when " 'the jury, in order to believe the core of the testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant.' " Carpentier, 689 F.2d at 28 (quoting Berkowitz, 662 F.2d at 1134) (emphasis added); see also Serpoosh, 919 F.2d at 838; Potamitis, 739 F.2d at 790. Similarly, severance should be granted when antagonism at the essence of the defenses prevails to such a degree--even without being mutually exclusive--that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty. See Serpoosh, 919 F.2d at 838; Berkowitz, 662 F.2d at 1134. Thus, an adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses.
 
 
 35
 The defenses Cardascia and Rizzo offered, though antagonistic and at points inconsistent, were not mutually exclusive at their core or essence. Cardascia claims he was duped by the codefendants, who defrauded both Flushing Federal and himself, as president of the bank. Similarly, Rizzo claims that he was not a part of the conspiracy, but rather an innocent and unknowing bystander implicated only by the uncorroborated assertions of his codefendants. But appellants failed to establish that due to the conflicting defenses, the jury could not have determined that the other defendants--and their unindicted co-conspirators, the witnesses who served as the government chief witnesses at this trial--defrauded Cardascia and the bank, and implicated Rizzo without his knowing it. Thus, the essence of both defenses--that each defendant was not involved in the conspiracy--plainly is typical of co-conspirator trials and does not warrant severance.
 
 
 36
 Rizzo additionally contends that the adversarial stance of Cardascia's attorney, who Rizzo asserts acted essentially as a second prosecutor, generated trial conditions so prejudicial to him as to deny him a fair trial. He insists that permitting Cardascia's counsel a defense rebuttal after the other defense summations but before the prosecution's rebuttal violated the Federal Rules of Criminal Procedure. He suggests this is clear proof of the prejudicial adversarial stances taken by the codefendants.
 
 
 37
 Certainly this order of summations was out of the ordinary, but it is a subject upon which the federal rules are silent. The rules set forth a uniform order for appearance by parties in closing arguments, stating that after the close of the evidence the prosecution shall open the argument and close with a rebuttal after the defendants have replied in their closing arguments. See Fed.R.Crim.P. 29.1. This rule is designed to control the order of closing arguments, and to permit the defendant to respond to the prosecution in an informed manner. Advisory Committee Note to Fed.R.Crim.P. 29.1.
 
 
 38
 Aside from controlling the order of appearances in the closing arguments, inasmuch as the prosecution must go first, Rule 29.1 does not limit the discretion of the trial judge whose obligation it is to ensure a fair and orderly procedure in the closing arguments to the jury. See United States v. Gleason, 616 F.2d 2, 26 (2d Cir.1979) (defendants offered opportunity for surrebuttal in face of eleventh hour surprise). In light of the blameshifting and peripheral inconsistencies in defense strategies that prevailed at trial, defense rebuttals were well within the ambit of a trial court's broad discretion in such matters.
 
 
 39
 Appellant Cardascia insists further that severance was improperly denied because the government deliberately joined Martorelli as codefendant for the sole purpose of eliminating him as a favorable witness for Cardascia's defense. When a defendant moves for a severance because he asserts a codefendant would offer exculpatory testimony at a separate trial, four factors must be examined: (1) proof that a codefendant would waive his Fifth Amendment privilege and testify at a severed trial; (2) whether exculpatory testimony would be cumulative; (3) the policy favoring judicial economy, and (4) whether it is likely that the offered testimony would be subject to effective impeachment. See United States v. Sliker, 751 F.2d 477, 496 (2d Cir.1984).
 
 
 40
 We begin by pointing out that Cardascia fails to identify any potential testimony of Martorelli--whose defense was that he was Cardascia's pawn in addition to being duped by the other codefendants--that would exculpate him. Nor has he shown that Martorelli was willing to testify in a separate proceeding. That the trials are severed would not mean that Martorelli would not still be subject to indictment and therefore concerned about exercising his Fifth Amendment right. There would also have been substantial duplication of proof were there separate trials, and Martorelli's testimony would have been subject to substantial cross-examination in light of his participation in so many aspects of both conspiracies. Without reviewing whether the proposed exculpatory testimony would not have been cumulative, which Cardascia fails to assert, and in light of the overwhelming evidence presented at trial in support of the appellant's conviction, we conclude that Cardascia has failed to demonstrate that the trial court abused its discretion in denying his motion to sever his trial.
 
 II Resignation Letter
 A. Hearsay Statement
 
 41
 Appellant Martorelli maintains that the trial court erroneously excluded his resignation letter to Cardascia and that this improper ruling prevented him from presenting his defense and thereby denied him a fair trial. In his opening, Martorelli's attorney briefly alluded to Martorelli's resignation, but not specifically to the resignation letter. No attempt was made to introduce the letter into evidence until the trial was more than half over. Martorelli declares that his defense depended on this letter to demonstrate that he lacked the requisite criminal intent.
 
 
 42
 Before the trial began, Judge Weinstein instituted a procedure governing the admission of documents under which notice of a document's introduction was given and technical objections regarding its authenticity were heard in advance without disrupting the progress of the lengthy trial. Thus, documents were partially admitted with respect to their authenticity, but objections regarding relevancy and hearsay were expressly reserved for that point in the trial when the document was actually to be introduced and used. Although claiming he relied on the supposed prior admission of the letter--introduced by the prosecution at the commencement of the trial but never used by it--Martorelli's attorney first asked at a point late in the trial if the document had been admitted into evidence. Upon being advised that it had not, Martorelli sought to introduce it into evidence over the objection of Cardascia, but with the apparent acquiescence of the prosecution.
 
 
 43
 Martorelli's attorney argued that the letter tended to show his client's innocence during the course of the conspiracy. When Cardascia objected that he would not be able to cross-examine Martorelli, Judge Weinstein ruled that the letter was inadmissible. He determined that the letter had been written by Martorelli in his own self-interest--after he had withdrawn from the conspiracy--and not in furtherance of the conspiracy or of his codefendants' interests. He further found that the statement contained in the letter was not the product of a contemporaneous state of mind, but was intended rather for use by the jury to infer a state of mind that had occurred six months earlier. The trial court characterized the letter as a "self-serving post conspiratorial statement."
 
 
 44
 Hearsay evidence is any statement made by an out-of-court declarant and introduced to prove the truth of the matter asserted. See Fed.R.Evid. 801(c). Generally it is not admissible, Fed.R.Evid. 802, because traditional conditions of admissibility, including that the witness be present at the trial, testify under oath, and be subject to cross-examination, all of which together permit a jury to evaluate the reliability and trustworthiness of a statement, are not present. See United States v. Detrich, 865 F.2d 17, 20 (2d Cir.1988). Of course, every out-of-court statement is not hearsay, and all hearsay is not automatically inadmissible at trial. Instead, the purpose for which the statement is being introduced must be examined and the trial judge must determine whether--if that purpose is to prove the truth of its assertion--the proffered statement fits within any of the categories excepted from the rule's prohibition.
 
 
 45
 Under the Federal Rules of Evidence, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay." Advisory Committee Note to Fed.R.Evid. 801(c). Statements not considered hearsay are typically verbal acts that give rise to legal consequences. See United States v. Kohan, 806 F.2d 18, 21-22 (2d Cir.1986) (statements of third party to defendant about source of checks was not hearsay because they were offered not to prove the truth of the statements but rather that defendant believed them and was not aware checks were stolen); United States v. DiMaria, 727 F.2d 265, 270 n. 4 (2d Cir.1984); United States v. Press, 336 F.2d 1003, 1011 (2d Cir.1965) ("statements inadmissible to prove the truth of the matter they assert may be admitted if the fact of the assertion is in itself relevant."); 4 Weinstein's Evidence p 801(c).
 
 
 46
 Unlike a legally operative statement, Martorelli's letter did not have legal consequence. The statement's significance does not lie solely in the fact that it was made. Instead, the letter was sought to be introduced to prove the truth of the matter asserted, that is, Martorelli resigned as assistant vice-president of the bank because he disagreed with the policies and practices of Cardascia, creating the inference that he was not acting in concert with the conspirators in defrauding the bank.
 
 B. State of Mind Exception
 
 47
 Martorelli believes the letter should be admitted as a statement demonstrating his then-existing mental state. The state of mind exception to the hearsay rule allows into evidence, even though the declarant is unavailable, "[a] statement of the declarant's then existing state of mind ... but not including a statement of memory or belief to prove the fact remembered or believed." Fed.R.Evid. 803(3) (emphasis added). The exclusion of "statement[s] of memory or belief [proffered] to prove the fact remembered or believed" is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind. Advisory Committee Note to Fed.R.Evid. 803(3). See United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir.1986) (post-conspiratorial statements offered to prove a lack of criminal intent two years earlier when alleged conspiracy occurred not admissible).
 
 
 48
 This exclusion from the state of mind exception grew out of Justice Cardozo's opinion in Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), where the Supreme Court refused to admit, under the state of mind exception to the hearsay rule, a statement by the defendant's wife that "Dr. Shepard has poisoned me." The Court said, "[t]he testimony now questioned faced backward and not forward ... What is even more important, it spoke to a past act, and even more than that, to an act by some one not the speaker." Id. at 104, 106, 54 S.Ct. at 25, 26.
 
 
 49
 Recognizing that the exception under Rule 803(3) is a specialized application of the present sense impression and excited utterance exceptions preceding it in Rule 803, the reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation. See United States v. Harris, 733 F.2d 994, 1004 (2d Cir.1984). As we noted in Harris, the likelihood that the declarant is misrepresenting his state of mind is not an additional qualification to the admissibility of state of mind hearsay statements. See 733 F.2d at 1005. "If a declaration comes within a category defined as an exception, the declaration is admissible without any preliminary credibility finding by the judge, save for the "catch-all" exceptions of Rules 803(24) and 804(5)." United States v. DiMaria, 727 F.2d 265, 272 (2d Cir.1984). Instead, the self-serving nature of a statement is considered when the jury weighs the evidence at the conclusion of the trial. This system of "class exceptions coupled with an open-ended provision in Rules 803(25) and 804(5)," 4 J. Weinstein and M. Berger, Weinstein's Evidence p 800, is preferable, "even though [it] excludes certain hearsay statements with a high degree of trustworthiness and admits certain statements with a low one," DiMaria, 727 F.2d at 272. This is because the process avoids the disruption, delay, and intrusion into the jury's province that preliminary determinations by the trial judge would entail. See Harris, 733 F.2d at 1005.
 
 
 50
 We add though that a determination of whether a statement falls within the state of mind exception requires a predicate finding as to whether the statement relates to a then existing state of mind or to a past memory or belief offered to prove the fact remembered or believed. Whether a statement is part of a continuous mental process and therefore admissible under the present state of mind exception is necessarily a question for the trial court. This same contemporaneity determination is made by the trial judge under the present sense impression and excited utterance exceptions. Advisory Committee Note to Fed.R.Evid. 803(1) and (2). See Jackson, 780 F.2d at 1315 (among requirements which must be met is a showing that the statement is contemporaneous to event sought to be proved); United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir.1985) (in making inquiry into admissibility under 803(3), the trial court must evaluate the statement's contemporaneousness).
 
 
 51
 C. Admissibility of Letter under Rule 803(3)
 
 
 52
 Consequently, if Martorelli's letter were excluded merely because the trial court doubted its trustworthiness and found that its lack of contemporaneousness to the conduct to which it related created a probability that the statement was deliberately fabricated, the decision to deny the document's admission under the state of mind exception would be improper. But the trial judge properly determined that this letter falls within the exclusion delineated in the state of mind exception. By stating that he disagreed with the policies and decisions made when Flushing Federal extended the loans to the Rapp nominees, Martorelli was making "a statement of memory or belief" to prove that he had not agreed with Cardascia's decisions when they were made and therefore lacked the requisite criminal intent. The appendix attached to the letter dated February 18, 1985 refers to Martorelli's disagreement with, among other transactions, the Rapp nominee loans extended by the bank during the last six months of 1984.
 
 
 53
 Appellant cites DiMaria and Harris in support of his argument that the resignation letter was improperly excluded from evidence. Reliance on these cases is misplaced. In DiMaria, the defendant, who was tried for unlawful possession of stolen cigarettes travelling in interstate commerce, stated to approaching federal agents, "I thought you guys were just investigating white collar crime; what are you doing here? I only came here to get some cigarettes real cheap." DiMaria, 727 F.2d at 270. In holding that the statement was improperly excluded, the court stated that the statement fell within the state of mind exception because it negated a present intent to possess a quantity of cigarettes in violation of a criminal statute. Similarly, Harris, who was tried for conspiracy to possess and distribute heroin, stated to an attorney and his parole officer that he believed the government was trying to set him up and that an informant had brought a government agent to him. Again, we determined that the statement should have been admitted under the state of mind exception because it was a statement of the defendant's then existing state of mind. See 733 F.2d at 1003-04. To admit statements of one's state of mind with regard to conduct that occurred eight months earlier as in this case would significantly erode the intended breadth of this hearsay exception. Thus, we cannot say that in this case the trial court committed error in refusing to admit the letter under Rule 803(3).
 
 
 54
 D. Admissibility of Letter under Rule 803(24)
 
 
 55
 Appellant Martorelli insists that the trial court's decision not to admit the letter was improper with regard to the "catch all" exception of Fed.R.Evid. 803(24). This exception provides that "[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness [is admissible], if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by the admission of the statement into evidence."
 
 
 56
 A determination that evidence is not admissible under the Rule 803(24) exception to the hearsay rule is reviewed under an abuse of discretion standard. See Jackson, 780 F.2d at 1316; United States v. Rodriguez, 706 F.2d 31, 41 (2d Cir.1983) (abuse of discretion governs review of "catch all" exception under 804(b)(5)). The insufficient guarantees of reliability and trustworthiness of the letter when examined in light of the purposes of this exception to the hearsay rule, and the availability of other evidence, including Martorelli's own testimony, preclude us from disturbing the district court's ruling. See Jackson, 780 F.2d at 1316 (taped exculpatory statements made two years after the cessation of the conspiracy between the defendants and a suspected informant were excluded from evidence under 803(24)).
 
 
 57
 Nor do we agree with appellant that the timing of the trial judge's ruling denied him a fair trial. We accept that evidentiary errors and reversed rulings may prejudice a defendant in such a way that he is denied a fair trial and his conviction must then be reversed. See Kohan, 806 F.2d at 22 ("when an evidentiary ruling precludes or impairs the presentation of defendant's sole means of defense, we are reluctant to deem it harmless"); Swietlowich v. County of Bucks, 610 F.2d 1157 (2d Cir.1979) (if the court changes a prior ruling, it should state its reasons and insure that the defendant is not prejudiced by his reliance).
 
 
 58
 But such is not the case here. No evidentiary error occurred. No earlier ruling or pronouncement was reversed. Accepting for purposes of discussion that appellant's counsel had relied on the letter's supposed previous admission and that his defense centered on the letter--which we do with great skepticism due to a total absence up to this point in the trial of any reference to the letter by Martorelli and due to defense counsel's lack of knowledge as to whether the letter had even been previously admitted--we believe appellant's reliance on the letter's admission into evidence was unreasonable. First, all documents at trial, including the resignation letter, were subject to the same procedure in which they were conditionally admitted for authenticity at an earlier point with objections for relevancy and hearsay reserved. Although the letter of resignation may have been included on a document list prepared by the prosecution, no party had sought to use the document before Martorelli. Thus, it was unreasonable to presume that hearsay and relevance objections would be barred at that point, and it was within the trial court's proper exercise of discretion to rule on the letter's admissibility at that time.
 
 
 59
 United States v. Mendel, 746 F.2d 155 (2d Cir.1984), upon which appellant heavily relies, does not support a contrary conclusion. In Mendel, we found that the defendant was denied a fair trial when the trial court, at the end of the proceeding, reversed an earlier pronouncement that testimony would be disregarded based on the court's credibility findings and instead relied to a significant degree on that very testimony in convicting the defendant. That 180-degree reversal, made after the proceedings had concluded, renders Mendel inapposite to the present case. There, the defendant, in relying on the court's pronouncement, had foregone presenting rebuttal witnesses and elected not to testify on his own behalf. Here, no "pronouncement" was made by the trial court and excluding the evidence was not a reversal of any earlier ruling. Nor was Martorelli precluded from introducing other evidence at the time the letter was ruled inadmissible. Consequently, it may not be successfully contended that the decision to exclude the letter improperly denied Martorelli an opportunity to present a defense or denied him a fair trial.
 
 CONCLUSION
 
 60
 The judgments of conviction of all five appellants are affirmed.